***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar. Plaintiff has shown good grounds to reconsider the evidence with regard to the compensability of plaintiff's knee condition. Accordingly, the Full Commission reverses in part and affirms in part the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on September 25, 2000, and incorporated herein by reference, and at the hearing before the Deputy Commissioner as
 STIPULATIONS
1. The Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant was a duly qualified self-insured, with Constitution State Service Company as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury on January 8, 1999, which is the subject of I.C. File 973613. Plaintiff was out of work from May 12, 1999 to July 18, 1999 and from October 22, 1999 to June 5, 2000. Defendant denies plaintiff's left hip and leg complaints as being compensable consequences of this incident.
5. Plaintiff alleges that he sustained an injury by accident to his lower extremities and hip on or about April 6, 1999, which is the subject of I.C. File 929643. Plaintiff contends this injury was a derivative of the January 1999 injury and defendant disputes this contention.
6. The issues for determination are:
 a. Whether plaintiff's hip and lower extremity problems are causally related to the admittedly compensable injury? Or, in the alternative,
 b. Whether plaintiff sustained an injury by accident on April 6, 1999, and if so, to what benefits may he be entitled under the Act? And if so, what is plaintiff's average weekly wage?
7. The parties stipulated the following documentary evidence:
a. Company Medical File, thirty-six pages,
b. Stanly Memorial Hospital, thirty-five pages,
c. Albemarle Family medical Center, six pages, and
d. Albemarle Medical Services, fifteen pages.
8. Plaintiff received short-term disability benefits from an employer-sponsored, non-contributory plan for which defendant is entitled to a credit in the amount of $17,078.14.
9. The depositions of Dr. Jonathan Paul, plaintiff's rebuttal testimony, and lay witnesses Forest Davis and Gary Morton are a part of the evidentiary record.
 *********** RULING ON MOTION TO STRIKE
Upon due consideration, plaintiff's Motion to Strike is GRANTED. The exhibit offered through the deposition testimony of Gary Morton was not a document prepared by Mr. Morton, as such, he is not a competent witness to authenticate the document and no proper foundation has been laid for the admission of this document. Without the testimony of the maker of the document as to its authenticity and how it was prepared, any testimony by Mr. Morton relating to the document is hearsay, and therefore inadmissible.
 ***********
Based upon the evidence of record, the Full Commission finds as fact the following
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a twenty-eight year old high school graduate. Plaintiff worked for defendant as a pot servicer from 1992 until 1994 when he was laid off. Plaintiff returned to work for defendant in 1997. He was assigned to work as a pot tenderizer, where his duties included maintaining the aluminum pots. As of the date of the hearing before the Deputy Commissioner, plaintiff was working as a crane operator and pot servicer.
2. Plaintiff had a history of left knee tenosynovitis in 1992 and a left ankle fracture in 1997 for which he received limited medical treatment.
3. On January 8, 1999, plaintiff was working as a pot servicer, where he was following a block of carbon with his rake. The block was twenty-two inches wide by three to three and one-half feet long, and it weighed over two thousand pounds. A twenty-ton crane was needed to move the carbon block. As the crane operator who was somewhat inexperienced moved the carbon block toward the pots, he did not have the block high enough and the block struck the aluminum rake handle that plaintiff had been using, causing the solid rake head to forcefully strike plaintiff on the inner part of the left knee and thigh. Plaintiff was on the second step preparing to step up onto the deck plate when the rake hit him. The force threw plaintiff off of the second step onto his hand and hip landing in a semi-crouching or squatting position after the impact and then stumbling down the concrete steps off the catwalk to the floor area. Forest Davis, the pot room shift supervisor saw this accident, heard plaintiff cry out, and witnessed him stumble to the floor.
4. Following this incident, plaintiff went to First Aid, where he complained of left thigh and knee pain as a result of the incident. An injury/illness/injury-free form (Triple I) was completed, reflecting plaintiff had a left thigh contusion. Plaintiff was instructed to apply ice to the area and to rest over the weekend.
5. On January 11, 1999, plaintiff was seen for knee and left thigh complaints at Stanly Memorial Hospital and Larry Roediger, P.A. diagnosed plaintiff with a contusion to the left quadriceps and left knee pain. Plaintiff was treated with Ibuprofen, ice and a soft knee splint and was released to light duty to ambulate as tolerated. On January 12, 1999, plaintiff sought medical treatment for the left leg from Dr. Whitman Smith. He released plaintiff to work modified duty for one week and then to return to full duty. On January 15, 1999, plaintiff was again seen at Stanly Memorial Hospital for left knee and leg complaints and was diagnosed with a contusion of the left leg and knee. Plaintiff remained restricted to light duty and was advised to use warm heat to treat his leg and exercise with a return to work on a full duty basis beginning January 21, 1999. Plaintiff's left knee pain improved but he became less physically active and his knee remained painful for a month or a month and a half after his injury.
6. On April 6, 1999, plaintiff experienced severe hip pain which he at first thought was a cramp, a common occurrence when working in the heat. Consequently, plaintiff did not report to First Aid. Instead, plaintiff went home to rest and telephoned that night to report left hip pain to Gary Morton who was the pot room supervisor on duty at the time of the call. Plaintiff explained to Mr. Morton that he did not know if the problem was from the previous fall in January and that he would go to the doctor the next day. Mr. Morton entered plaintiff's call in the logbook of absences and, as a result, a second Form 19 was filled out indicating a hip injury on April 6, 1999, which is the subject of I.C. File No. 929643.
7. On April 7, 1999, Jeffrey Chance, P.A., of Albemarle Medical Services, examined plaintiff for left hip and sciatic pain. Plaintiff was placed on modified duty for one week.
8. On April 13, 1999, plaintiff returned to Mr. Chance, at which time physical therapy was ordered. Plaintiff related his problems to the injury on January 8, 1999. Mr. Chance referred plaintiff to orthopedic surgeon Dr. Jonathan Paul of NorthEast Orthopedics after physical therapy did not resolve the hip complaints.
9. On May 20, 1999, Dr. Paul examined plaintiff for complaints of left hip pain and plaintiff related a previous work-related injury with a contusion to his left thigh. Dr. Paul diagnosed plaintiff with a "popping" hip with greater trochanteric bursitis, for which he gave plaintiff an injection and anti-inflamatories and prescribed physical therapy and exercises. Dr. Paul indicated that considering the mechanism of injury, plaintiff's trochanteric bursitis could be related to the injury at work. Dr. Paul did not examine plaintiff's left knee on this occasion. On June 9, 1999, plaintiff returned to Dr. Paul with complaints of left knee, hip and ankle problems which plaintiff indicated began after his injury at work. Plaintiff had a small amount of fluid in his knee with tenderness over the medial joint line and a full range of motion. Dr. Paul prescribed another anti-inflammatory, recommended continued home therapy and kept plaintiff out of work for an additional four weeks. At this time, Dr. Paul's focus of treatment remained on plaintiff's left hip complaints.
10. Dr. Paul again saw plaintiff on July 1, 1999 at which time plaintiff continued to have left hip pain and plaintiff complained of worsening left knee pain with some popping. Dr. Paul prescribed anti-inflamatories and gave plaintiff a return to work note for July 6, 1999 with restrictions of no repetitive bending or stepping as plaintiff's hip problems would be exacerbated by repetitive "step up" activities.
11. On July 19, 1999, Dr. Scott Smith performed a second opinion examination of plaintiff, injected plaintiff's left hip and diagnosed plaintiff with tensor fascialata syndrome with painful bursitis of the left hip. Dr. Smith agreed with the treatment recommended by Dr. Paul.
12. Plaintiff returned to Dr. Paul on August 9, 1999 with continued complaints of left hip and knee pain and new complaints of pain in both ankles. Once again, plaintiff had a small amount of fluid in his knee with tenderness over the medial joint line and a full range of motion. Plaintiff had pain with McMurray's maneuver, which is a test to determine a meniscus tear. However, plaintiff's knee did not "pop" during the maneuver so the test was not conclusively positive. Due to plaintiff's history and examination including the pain during the maneuver, an MRI was obtained. The results as read by a radiologist indicated a Grade II signal of the medial meniscus which is not clearly indicative of a tear. However, after further review by Dr. Paul, his assessment was that of a Grade III signal of the meniscus requiring arthroscopy in light of plaintiff's continued symptoms after conservative treatment.
13. Therefore, on October 27, 1999, Dr. Paul performed arthroscopic knee surgery, which revealed normal meniscus on the surface of plaintiff's left knee in accordance with the original reading by the radiologist with changes in the substance of the meniscus revealing that plaintiff may have had a tear inside the inner part of the meniscus. Regardless, Dr. Paul felt that plaintiff's primary problem was a cartilage defect or chondromalacia where the kneecap meets the thighbone. A loose edge of cartilage was causing the popping and swelling of plaintiff's left knee as well as his difficulty with repetitive stepping. Cartilage defects or chondromalacia can be idiopathic, genetic or caused by trauma. Direct trauma to the kneecap or hyperflexion by squatting could cause this condition. In fact, Dr. Paul indicated that plaintiff's injury of being hit with force on the left thigh and knocked into a squatting position could have caused plaintiff's knee condition.
14. Dr. Paul examined plaintiff post-operatively on October 28, 1999 and restricted plaintiff to office work and instructed him to return in six (6) weeks. Plaintiff instead returned in three (3) weeks continuing to complain of some popping in his left knee. Dr. Paul again saw plaintiff in follow-up on December 20, 1999 at which time plaintiff had been discharged from physical therapy but had little improvement. Plaintiff had no swelling of the knee, full range of motion of the hip and continued tenderness of the hip. Dr. Paul felt that plaintiff was improving slowly and gave plaintiff work restrictions of no repetitive stepping, prescribed Daypro and instructed plaintiff to return in six (6) weeks.
15. Plaintiff continued to have left hip problems and was seen again by Dr. Paul in February 2000 for continued complaints as well as new complaints of right-sided hip popping. Dr. Paul continued to advise conservative treatment and recommended against hip surgery. Plaintiff's work restrictions remained the same and Dr. Paul felt that plaintiff might need to find employment that did not require repetitive "step up" activities.
16. The greater weight of the lay and medical evidence including the testimony of Dr. Paul demonstrates that plaintiff sustained a left knee injury as a result of the January 8, 1999 injury by accident. Furthermore, Dr. Paul related plaintiff's left thigh and left hip complaints to the accident which plaintiff sustained on January 8, 1999. Moreover, the greater weight of the medical evidence demonstrates that plaintiff's gait problems and subsequent right hip pain were a compensable consequence of the January 8, 1999 accident.
17. Dr. Paul continued to treat plaintiff and found plaintiff had reached maximum medical improvement on March 31, 2000. On May 2, 2000, Dr. Paul provided a permanent partial impairment rating of five percent (5%) to the left knee and later Dr. Paul provided a permanent partial impairment rating of three percent (3%) to the left hip.
18. Plaintiff's average weekly wage at the time of the January 8, 1999 accident was $601.20, which yields a weekly compensation rate of $400.82.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury by accident arising out of and in the course of the employment on January 8, 1999 thereby sustaining injuries to his left hip and knee which later resulted in right hip complaints. N.C. GEN. STAT. § 97-2(6).
2. Since plaintiff did not sustain a new injury by accident arising out of and in the course of his employment on April 6, 1999, he is not entitled to benefits under I.C. File No. 929643. However, the problems complained of on April 6, 1999 involve a continuation and worsening of plaintiff's injuries and symptoms as a result of his original January 8, 1999 compensable injury by accident. N.C. GEN. STAT. § 97-2(6).
3. As a result of the compensable injury, plaintiff is entitled to temporary total disability compensation at the rate of $400.82 per week for the periods from May 12, 1999 through July 18, 1999 and from October 22, 1999 through June 5, 2000. Defendant is entitled to a credit for short-term disability benefits paid to plaintiff under the employer-sponsored plan. N.C. GEN. STAT. § 97-29; § 97-42.
4. Plaintiff is entitled to permanent partial disability compensation at the rate of $400.82 per week for six (6) weeks as a result of the three percent (3%) rating to the left hip and for ten (10) weeks as a result of the five percent (5%) rating to the left knee. N.C. GEN. STAT. § 97-31.
5. Subject to the limitations of N.C. GEN. STAT. § 97-25.1, plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injuries to plaintiff's left knee and hip as well as any resulting right-sided complications for so long as such expenses are for treatment reasonably required to provide relief, effect a cure or lessen the period of disability. N.C. GEN. STAT. § 97-2(19); § 97-25; § 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to a reasonable attorney's fee and defendant's entitlement to a credit, defendant shall pay temporary total disability compensation to the plaintiff at the rate of $400.82 per week for the periods from May 12, 1999 through July 18, 1999 and from October 22, 1999 through June 5, 2000, under I.C. File No. 973613 concerning plaintiff's January 8, 1999 injury by accident. Said compensation has accrued and shall be paid in a lump sum.
2. Subject to a reasonable attorney's fee and defendant's entitlement to a credit, defendant shall pay permanent partial disability compensation at the rate of $400.82 per week for six (6) weeks as a result of the three percent (3%) rating to the left hip and for ten (10) weeks as a result of the five percent (5%) rating to the left knee, under I.C. File No. 973613 concerning plaintiff's January 8, 1999 injury by accident.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraphs 1 and 2 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Subject to the limitations of N.C. GEN. STAT. § 97-25.1, defendant shall pay medical expenses incurred or to be incurred as a result of the compensable injuries to plaintiff's left knee and hip as well as any right-sided complications that arose as a result for so long as such expenses are for treatment reasonably required to provide relief, effect a cure or lessen the period of disability when bills for the same have been approved, in accordance with the provisions of the Act, under I.C. File No. 973613 concerning plaintiff's January 8, 1999 injury by accident.
5. Plaintiff's claim for benefits under I.C. File No. 929643 concerning a new injury date of April 6, 1999 is, and the same must be DENIED.
6. Defendant shall pay the costs due the Commission.
This the ___ day of February 2002.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER